Francis J. "Casey" Flynn, Jr., #304712
**LAW OFFICE OF FRANCIS J. FLYNN, JR.**
6057 Metropolitan Plz.
Los Angeles, CA 90036
Tele: 314-662-2836
Email: casey@lawofficeflynn.com

[Additional Counsel Listed Below]

**COUNSEL FOR PLAINTIFFS**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JAMES WRIGHT, derivatively on behalf of DOXIMITY, INC.,<br><br>Plaintiffs,<br>v.<br><br>JEFFREY TANGNEY, KEVIN SPAIN, KIRA WAMPLER, REGINA BENJAMIN, TIMOTHY CABRAL, PHOEBE L. YANG, ANNA BRYSON, NATE GROSS, AND PERRY GOLD,<br><br>Defendants,<br><br>-and-<br><br>DOXIMITY, INC., a Delaware Corporation,<br><br>Nominal Defendant. | **CASE NO. 3:26-cv-11047**<br><br>**JURY TRIAL DEMANDED**<br><br>**PLAINTIFF'S VERIFIED DERIVATIVE COMPLAINT FOR DAMAGES:**<br><br>**(1) BREACH OF FIDUCIARY DUTY (DERIVATIVELY AGAINST THE DIRECTOR DEFENDANTS);**<br>**(2) BREACH OF FIDUCIARY DUTY (DERIVATIVELY AGAINST THE OFFICER DEFENDANTS);**<br>**(3) GROSS MISMANAGEMENT (AGAINST ALL DEFENDANTS)**<br>**(4) WASTE OF CORPORATE ASSETS (DERIVATIVELY AGAINST ALL DEFENDANTS)**<br>**(5) UNJUST ENRICHMENT (DERIVATIVELY AGAINST** |

| | |
|---|---|
| | THE OFFICER DEFENDANTS)<br>(6) VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT (AGAINST THE DIRECTOR DEFENDANTS) |

Plaintiff James Wright ("Plaintiff"), derivatively on behalf of Doximity, Inc. ("Doximity" or the "Company"), brings the following complaint against the Company's board of directors (the "Board") and executive officers for breaches of fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, and violation of Section 14(a) of the Securities Exchange Act of 1934. Except for allegations specifically pertaining to Plaintiff and Plaintiff's own acts, the allegations in the Complaint are based upon information and belief, which include but are not limited to: (i) the Company's public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) pleadings filed in *Michigan Laborers' Pension Fund v. Doximity et al.* (N.D. Ca. Case No. 3:26-cv-10529) (the "Securities Class Action"); (iii) corporate governance documents available on the Company's website; (iv) media reports; and (v) other publicly available information.

**NATURE OF THE ACTION**

1. This is a stockholder derivative action brought by Plaintiff, a stockholder of Doximity, on behalf of the Company against the Defendants. This action alleges breaches of fiduciary duty by the Board and senior executive officers occurring from at least August 8, 2024, to May 13, 2026 (the "Relevant Time Period"). During that time the Defendants (as defined herein) caused or allowed Doximity to issue or make materially false and misleading statements concerning the Company's financial condition and business operations.

2. Doximity operates a digital platform for medical professionals that integrates health care news, clinical workflow tools, and professional networking.

Often described as the "LinkedIn for doctors," Doximity generally makes its platform available to medical professionals at no charge, subject to limited exceptions.

3. Doximity derives most of its revenue from marketing subscriptions purchased by pharmaceutical companies, hospitals, and other customers seeking to advertise on its platform. The Company represents that the vast majority of these advertisements appear on its social-media-like "Newsfeed" platform.

4. Doximity differentiates its platform from competing services by emphasizing "deep engagement." According to the Company, a "deep engagement" occurs when a user makes a "click" on an advertisement or sponsored content to access its full version, signaling an intent to view the entire advertisement or content. Doximity accordingly promoted its Newsfeed as delivering "click" based engagement.

5. Many competing platforms, by contrast, employ "light engagement" advertising models that rely on passive exposure. These methods include banner advertisements displayed along the bottom or side of a page, advertisements that obscure content until a user locates and clicks the "X" to close them, and inexpensive mass email campaigns.

6. Throughout the Relevant Time Period, Defendants represented that Doximity's Newsfeed was its "biggest revenue driver." They attributed the Company's growth to the Newsfeed, stating that growth was "led by our Newsfeed, which is both our most used and most monetized product." Defendants further claimed that the Newsfeed was continuing to "reach[ing] new highs," including "an all-time record of quarterly active prescribers and double-digit growth in the number of articles read or tapped." Emphasizing the Company's purported "deep engagement," Defendants assured investors that Doximity does not "bombard physicians with ads and messages in hopes of getting lucky" and that "[Doximity does not] have an e-newsletter product."

7. These representations concealed the true nature and performance of Doximity's advertising business. The Company overstated the contribution of its Newsfeed to revenue growth while losing market share to competitors offering more attractive pricing and engagement models. Despite its repeated representations to the contrary, Doximity also relied heavily on banner advertisements and email newsletters.

8. The truth began to emerge on November 6, 2025. Although Doximity reported strong second-quarter results, it expressed caution about anticipated advertising spending and signaled that sales growth would slow during the second half of fiscal year 2026, which ended on March 31, 2026. Following these disclosures, Doximity's stock price fell $8.29 per share, or 13%.

9. Further disclosures followed on February 5, 2026, when Doximity reduced its full-year revenue guidance for fiscal year 2026 and reported slowing sales growth and declining net income, with adverse implications for its fourth-quarter performance. Analysts questioned whether broader advertising conditions adequately explained the Company's results, observing that "uncertainty is lingering. This is not widespread, meaning not all pharma[ceutical] clients are holding back" on advertising spending. Analysts also began to identify competitive losses as a potential explanation for Doximity's slowing growth. An Evercore analyst observed that older companies such as Doximity "are losing share while programmatic, social, and other new formats are gaining share." Following these disclosures, Doximity's stock price declined $5.59 per share, or 17%.

10. On May 13, 2026, Doximity disclosed that it had failed to meet its previously reduced revenue guidance and forecast substantially slower growth for fiscal year 2027, ending March 31, 2027. Several analysts subsequently downgraded the Company's stock, citing problems specific to Doximity's business. Freeman Capital Markets characterized the announcement as "a tough pill to swallow" as the stock reached "an all-time low," while Jefferies placed Doximity in the "penalty

box." Leerink Partners likewise placed the Company "in the penalty box," pointing to its "eye-catching" guidance and the "shock value" of "[a]ll of the dynamics that lead to the guidance, including market softness, timing of commitments and the spend to ramp its AI products." RBC Capital Markets observed that Doximity's stalled net revenue retention indicated an "increasingly competitive market." Following these disclosures, Doximity's stock price fell $5.38 per share, or 23%.

11. Through this action, Plaintiff seeks to hold the Board and executive officers accountable for making or causing the Company to make false and misleading statements, as well as the inadequate internal controls that allowed the misconduct to occur, in breach of their fiduciary duties to the Company.

## PARTIES

### A. Plaintiff

12. Plaintiff James Wright is a current shareholder of Doximity and has continuously held Doximity stock during all times relevant hereto and is committed to retaining Doximity shares through the pendency of this action to preserve standing. Plaintiff will adequately and fairly represent the interests of Doximity and its shareholders in enforcing its rights.

### B. Nominal Defendant

13. Nominal Defendant Doximity is a corporation organized and existing under the laws of the State of Delaware. The Company's principal executive offices are located at 500 3rd St., Suite 510, San Francisco, California. Doximity common stock trades on the NYSE under the ticker symbol "DOCS."

### C. Individual Defendants

14. Defendant Jeffrey Tangney ("Tangney") is a co-founder of the Company and has served as its Chief Executive Officer and a director since April 2010. Tangney also served as Chairman of the Board throughout the Relevant Time Period.

15. Defendant Kevin Spain ("Spain") has been a director of the Company since March 2011.

16. Defendant Kira Wampler ("Wampler") has been a director of the Company since March 2020.

17. Defendant Regina Benjamin ("Benjamin") has been a director of the Company since September 2020.

18. Defendant Timothy Cabral ("Cabral") has been a director of the Company since September 2020.

19. Defendant Phoebe L. Yang ("Yang") has been a director of the Company since August 2022.

20. Defendants Tangney, Spain, Wampler, Benjamin, Cabral, and Yang are herein referred to collectively as the "Director Defendants."

21. Defendant Anna Bryson ("Bryson") served as the Company's Chief Financial Officer from May 11, 2021, through April 13, 2026.

22. Defendant Nate Gross ("Gross") is a co-founder of the Company and served as its Chief Strategy Officer from 2010 through June 13, 2025.

23. Defendant Perry Gold ("Gold") served as the Company's Vice President of Investor Relations & Revenue Operations throughout the Relevant Time Period.

24. Defendants Tangney, Bryson, Gross, and Gold are herein referred to collectively as the "Officer Defendants." The Director Defendants and Officer Defendants are herein referred to collectively as the "Individual Defendants."

## JURISDICTION AND VENUE

25. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

26. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

27. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

28. Venue is proper in this court under 28 U.S.C. § 1391, because Doximity is headquartered in this District, and a significant amount of the conduct at issue took place and had an effect in this District.

## FURTHER SUBSTANTIVE ALLEGATIONS

### A. Company Background

29. Doximity operates an online platform marketed exclusively to medical professionals in the United States and is frequently described as "LinkedIn for doctors." The platform integrates health care news, workflow tools, and professional networking, enabling members to "connect" with one another and explore employment opportunities. According to the Company, most digital advertisements appear on its Newsfeed, a social-media-style platform that delivers a personalized stream of medical news, research, clinical developments, and advertisements tailored to users' areas of expertise.

30. Like many social media platforms, Doximity generally permits members to join and use its services without charge. The Company instead derives nearly all of its revenue from its Marketing Solutions segment, which sells digital advertising space to pharmaceutical companies and similar customers. Doximity represents that the vast majority of these advertisements appear on its Newsfeed.

31. Doximity promotes its service as a "deep engagement" platform. It characterizes a "deep engagement" as a user's "click" on an advertisement or sponsored content to access full-length written material. Such engagement

purportedly demonstrates the user's intent to view the advertisement or sponsored content and, by extension, serves as an indicator of its likely impact.

32. Many competing services operate as "light engagement" platforms that emphasize passive exposure to advertisements or sponsored content. Their advertising methods include easily overlooked banners along the bottom or side of a page, overlays that conceal underlying content until manually closed, and inexpensive mass email campaigns.

33. Advertising businesses commonly price their services according to the number of interactions with an advertisement or sponsored content, or the number of times it generates an "impression" by appearing on a user's screen. Doximity instead employs a proprietary "cost-per-target" pricing model. Under that model, customers purchase subscriptions to particular "modules," allowing them to target a specified number of Doximity members each month throughout the subscription term. Customers may also pay to direct advertisements to particular audience members based on characteristics such as medical specialty, credentials, and geographic location.

### D. Doximity's False and Misleading Statements

34. During the Relevant Time Period, Doximity and its executive officers made materially false and misleading statements about (a) the contribution of its Newsfeed to the Company's revenue growth; (b) the nature and extent of user engagement with advertisements and sponsored content on its platform; (c) the Company's reliance on banner advertisements and email newsletters; and (d) the Company's competitive position and ability to gain market share.

35. On August 8, 2024, Doximity reported its financial results for the first quarter of fiscal year 2025, which ended on March 31, 2025, in a Form 8-K filed with the SEC. The filing quoted Defendant Tangney as stating, "[w]e were pleased to

deliver strong profits and record engagement last quarter, as we beat on both our top and bottom lines."

36. During a conference call with analysts and investors that same day, Tangney attributed increases in quarterly revenue and adjusted EBITDA to record levels of deep engagement with advertisements and sponsored content on Doximity's Newsfeed. Tangney stated that the Newsfeed "set new records," with "article reads among prescribers reach[ing] an all-time high."

37. Tangney also linked the purported engagement growth to Doximity's competitive strength, stating that "with record engagement across our platform . . . we're even more confident in our competitive position and our ability to gain market share." Responding to an analyst's question about competition, Tangney further asserted that "we're gaining share, again, against our competition."

38. On November 7, 2024, Doximity conducted a conference call with analysts and investors concerning its second-quarter results for fiscal year 2025. Tangney again attributed quarterly revenue growth to Newsfeed engagement, describing the Newsfeed as Doximity's "biggest revenue driver" and stating that it had "hit an all-time record high of articles tapped or articles read." Tangney further represented that "Q2 was another record engagement quarter for us."

39. During the same call, an analyst asked, "how do you feel about kind of external factors of competition?" Defendant Gross responded, "We feel good about our ability to gain share and our competitive positioning . . . our ability to have really high-quality product, reach, authentic engagement and doctor centricity to these commercial programs remains key."

40. On February 6, 2025, Doximity reported its third-quarter results for fiscal year 2025 in a Form 8-K filed with the SEC. The filing quoted Tangney as stating, "[w]e're proud to deliver another quarter of record engagement in Q3."

41. On a conference call with analysts and investors that day, Tangney claimed that "our network engagement has never been stronger." He again

emphasized the Newsfeed's contribution, stating that "Newsfeed users continued to lead the way," and that "[f]or the first time ever, in Q3, more than 1 million unique active prescribers scrolled our feed to stay current on the latest news in their fields."

42. On May 15, 2025, Doximity reported its fourth-quarter and full-year results for fiscal year 2025 in a Form 8-K filed with the SEC. The filing quoted Tangney as stating, "[w]e closed out fiscal 2025 on a high note, with record engagement."

43. During the accompanying conference call with analysts and investors, Tangney credited the Newsfeed with driving Doximity's strong performance and quarterly revenue growth. He described the Newsfeed as the Company's "most used and most monetized product" and asserted that its "unique newsfeed users hit record highs," and "articles read or tapped were up more than 30% year-on-year."

44. During that same call, Tangney expressly denied that Doximity offered an e-newsletter product. Responding to an analyst's question about engagement through the Company's e-newsletter, Tangney stated, "we don't have an e-newsletter product, so just so I'm clear on that front. We do have a Newsfeed product."

45. On August 7, 2025, Doximity reported its first-quarter results for fiscal year 2026, which ended on March 31, 2026, in a Form 8-K filed with the SEC. The filing quoted Tangney as stating, "[w]e began our year with strong profit growth and record engagement across our newsfeed, workflow, and AI products."

46. During a conference call with analysts and investors that same day, Tangney again linked Doximity's revenue growth to Newsfeed engagement, stating, "[o]ur newsfeed also hit record highs, with over 1 million quarterly active prescribers and double-digit percent growth in articles read or tapped."

47. Throughout the Relevant Time Period, Doximity made its "media kit" publicly available through a link on the Hospital Solutions "Solution Finder" page of its website. The media kit represented: "you won't find any banner ads on Doximity. We don't bombard physicians with ads and messages in hopes of getting lucky. We

create content experiences that physicians value and actively seek. We leverage data to target them precisely, ensuring that every engagement is meaningful and creates impact."

48. Throughout the Relevant Time Period, Doximity's "About Us" webpage similarly represented: "Doximity doesn't bombard physicians with ads and messages in hopes of getting lucky. We create content experiences that physicians value and actively seek. We leverage data to target them precisely, ensuring that every engagement is meaningful and creates impact."

49. The statements described in paragraphs 35–48 were materially false and misleading because they misrepresented Doximity's advertising business and omitted material facts necessary to make those statements, in light of the circumstances in which they were made, not misleading. Specifically, Doximity overstated the Newsfeed's contribution to revenue growth, was losing market share to competitors offering more favorable pricing and engagement models and relied on banner advertisements and email newsletters contrary to its representations concerning deep engagement.

50. The foregoing statements were materially false and misleading, and failed to disclose materially adverse facts about the Company's business and operations. Specifically, the statements failed to disclose that: (a) Doximity overstated the Newsfeed's contribution to the Company's revenue growth; (b) Doximity was losing market share to competitors offering more favorable pricing and engagement models; (c) Doximity relied heavily on banner advertisements and email newsletters, contrary to its representations regarding its advertising methods; and (d) as a result, the Company's representations concerning the nature of user engagement, the sources of its revenue growth, and its competitive position were materially false and misleading.

**E. The Truth is Revealed**

51. The truth began to emerge on November 6, 2025, when Doximity expressed caution about the outlook for advertising spending and signaled slowing sales growth during the second half of fiscal year 2026, which ended on March 31, 2026. Following these disclosures, Doximity's stock price declined $8.29 per share, or 13%.

52. Nevertheless, during an earnings call with analysts and investors that same day concerning Doximity's second-quarter results for fiscal year 2026, Defendant Tangney continued to attribute the Company's performance to Newsfeed engagement. Tangney stated that the Newsfeed "led the way with an all-time record number of quarterly active prescribers and double-digit growth in the number of articles read or tapped."

53. Tangney's statement was materially false and misleading and omitted material facts necessary to make it, in light of the circumstances in which it was made, not misleading. Doximity had overstated the Newsfeed's contribution to revenue growth, was losing market share to competitors offering more favorable pricing and engagement models, and was employing light engagement advertising methods, including banner advertisements and email newsletters.

54. On February 5, 2026, Doximity reduced its revenue guidance for fiscal year 2026 and disclosed that sales growth had slowed and net income had declined, with adverse implications for its fiscal fourth-quarter performance.

55. Analysts questioned whether broader advertising conditions adequately explained these results, observing that "uncertainty is lingering. This is not widespread, meaning not all pharma[ceutical] clients are holding back" on advertising spending. Analysts also began to identify competitive losses as a potential explanation for Doximity's slowing growth. An Evercore analyst observed that older companies such as Doximity "are losing share while programmatic, social, and other new formats are gaining share." Following these disclosures, Doximity's stock price fell $5.59 per share, or 17%.

56. During the Company's earnings call that same day concerning its third-quarter results for fiscal year 2026, Defendant Gold attributed the slowdown to changes in customer purchasing behavior. Gold stated that the Company "heard from multiple customers, they deployed a lower percentage of their budget upfront." He characterized the change as "an anomaly for this year" and "not something that we expect to continue."

57. Doximity also reported its third-quarter results for fiscal year 2026 in a Form 8-K filed with the SEC that day. The filing quoted Defendant Tangney as stating, "[w]e're proud to deliver another quarter of . . . record engagement."

58. Doximity had overstated the Newsfeed's contribution to revenue growth and was losing market share to competitors offering more favorable pricing and engagement models. At the same time, the Company relied on banner advertisements and email newsletters to generate engagement, contrary to its representations concerning its advertising methods.

59. On May 13, 2026, Doximity disclosed that it had failed to meet its previously reduced revenue guidance and forecast substantially slower growth for fiscal year 2027, ending March 31, 2027. Several analysts subsequently downgraded Doximity's stock. Freeman Capital Markets characterized the announcement as "a tough pill to swallow" as the shares reached "an all-time low," while Jefferies placed the stock in the "penalty box." Leerink Partners likewise placed Doximity "in the penalty box" following its "eye-catching" guidance. RBC Capital Markets observed that the Company's stalled net revenue retention indicated an "increasingly competitive market." Following these disclosures, Doximity's stock price declined an additional $5.38 per share, or 23%, from $23.39 at the close of trading on May 13, 2026, to $18.01 at the close of trading on May 14, 2026.

**F. Defendants' Misconduct Has and Continues to Harm the Company**

60. As a direct and proximate result of the Defendants' conduct, the Company has been harmed and will continue to be. The harm includes, but is not

limited to, the costs already incurred and to be incurred defending the Company in the Securities Class Action, as well as costs to be incurred in remediating deficiencies in the Company's internal controls.

61. Doximity's reputation and goodwill have also been damaged by the Defendants' misconduct.

62. The Company awarded substantial compensation to the Officer Defendants during the fiscal years overlapping the Relevant Time Period. For fiscal years 2025 and 2026, covering April 1, 2024 through March 31, 2026, the Company reported more than $41.7 million in aggregate compensation awarded to, earned by, or paid to Defendants Tangney, Bryson, and Gross:

| **Defendant** | **Fiscal 2025** | **Fiscal 2026** | **Total Disclosed** |
|---|---|---|---|
| Jeffrey Tangney | $17,234,989 | $19,586,169 | $36,821,158 |
| Anna Bryson | $825,394 | $2,549,081 | $3,374,475 |
| Nate Gross | $1,520,444 | Not disclosed | $1,520,444 |
| Perry Gold | Not disclosed | Not disclosed | Not disclosed |
| **TOTAL DISCLOSED:** | **$19,580,827** | **$22,135,250** | **$41,716,077** |

63. The Defendants failed to oversee and manage the Company in accordance with their fiduciary duties and Company policies, making the compensation provided by the Company excessive. The Officer Defendants received millions of dollars in equity compensation based on stock prices that had been inflated because of the false and misleading statements made or caused by the Defendants. The Board has not clawed back any of this compensation.

64. In addition, the Board failed to ensure that it conducted a thorough investigation into the effectiveness of the Company's internal controls over financial reporting.

65. The Company has already incurred and will continue to incur costs to remediate the deficiencies in its internal controls over financial reporting, as well as to defend against the Securities Class Action.

**G. Doximity Issues False and Misleading Proxy Statements**

66. In addition to the false and misleading statements discussed above, the Director Defendants also caused the Company to issue false and misleading proxy statements during the Relevant Period, including the Schedule 14A Proxy Statements issued on July 16, 2025 (the "2025 Proxy"), that sought stockholder votes to, among other things, re-elect Defendants Tangney and Wampler to the Board as Class I directors for three-year terms expiring at the Company's 2028 annual meeting of stockholders.

67. The Director Defendants drafted, approved, reviewed, and/or signed the 2025 Proxy before they were filed with the SEC and disseminated to Doximity's stockholders. The Director Defendants negligently issued materially misleading statements in the 2025 Proxy. These allegations are based solely on negligence; they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Director Defendants and they do not allege or do not sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference or any allegation of fraud, scienter, or recklessness with regard to the 2025 Proxy allegations and related claims.

68. In support of re-electing themselves, the Director Defendants highlighted their supposed oversight of the Company in the 2025 Proxy. The 2025 Proxy stated:

> Our board has responsibility for the oversight of our risk management

processes and, either as a whole or through its committees, regularly discusses with management our major risk exposures, their potential impact on our business and the steps we take to manage them. The risk oversight process includes receiving regular reports from board committees and members of senior management to enable our board to understand our risk identification, risk management, and risk mitigation strategies with respect to areas of potential material risk, including operations, finance, legal, regulatory, cybersecurity, strategic, and reputational risk.

Our board believes that open communication between our management team and our board is essential to management and oversight. Our board meets with our Chief Executive Officer and other members of the senior management team at quarterly meetings of our board, as well as at such other times as they deem appropriate, where, among other topics, they discuss major risk exposures, their potential impact on our business and steps we take to manage them.

While our board is ultimately responsible for risk oversight, our board committees assist our board in fulfilling its oversight responsibilities in certain areas of risk. Our audit committee oversees and reviews the Company's guidelines and policies that govern the process by which the Company's exposure to risk is assessed and managed by management. More specifically, our audit committee assists our board in fulfilling its oversight responsibilities with respect to risk assessment and risk management in the areas of internal control over financial reporting, disclosure controls and procedures, legal and regulatory compliance, liquidity risk, enterprise risk management and cybersecurity. Our audit committee also discusses and considers with our management team and Deloitte & Touche LLP the Company's major financial, operational, privacy, security, competition, regulatory, enterprise, cybersecurity, and accounting risk exposures or other exposures and the steps that the Company's management has taken to monitor and control such exposures. Our nominating and governance committee assists our board in fulfilling its oversight responsibilities with respect to the management of risk associated with our board's organization, membership, structure, corporate governance and environmental, social and governance initiatives. Our compensation committee assesses risks created by the incentives inherent in our compensation policies. Finally, our full board reviews strategic and operational risk in the context of reports from our management team, receives reports on all significant committee

activities at each regular meeting and evaluates the risks inherent in significant transactions.

69. The 2025 Proxy thus assured stockholders that the Director Defendants understood Company-wide risks, actively oversaw the Company's risks and exposures, as well as steps taken to monitor and mitigate risk exposures. In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Defendants from causing the Company to make materially false and misleading statements concerning the Newsfeed's contribution to revenue growth, the nature and extent of user engagement, the Company's reliance on banner advertisements and email newsletters, and its competitive position and ability to gain market share.

70. As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to re-elect the Director Defendants to the Board.

**H. The Board Breached its Fiduciary Duties**

71. As officers and/or directors of Doximity, the Defendants owed Doximity fiduciary duties of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Doximity in a fair, just, honest and equitable manner. The conduct of the Director Defendants involves a knowing or reckless violation of their obligations as directors and officers of Doximity, the absence of good faith on their part, and a reckless disregard for their duties to the Company that Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

72. Defendants, because of their positions of control and authority as directors and/or officers of Doximity, were able to and did exercise control over the wrongful acts complained of herein. As officers and/or directors of a publicly traded company, the Defendants had a duty to prevent the dissemination of inaccurate and

untruthful information regarding Doximity's financial condition, performance, growth, operations, financial statements, business, management, earnings, internal controls, and business prospects, so as to ensure that the market price of the Company's common stock would be based upon truthful and accurate information.

73. To discharge their duties, the officers and directors of Doximity were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors and Doximity were required to, among other things:

(a) Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the Company's stockholders;

(b) Conduct the affairs of the Company in a lawful, efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(d) Oversee public statements made by the Company's officers and employees as to the financial condition of the Company at any given time, including ensuring that any statements about the Company's financial results and prospects are accurate, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e) Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(f) Maintain and implement an adequate and functioning system of internal controls to ensure that the Company complied with all applicable laws, rules, and regulations; and

(g) Ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

74. The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders, which the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

75. The Board's Audit Committee is tasked with overseeing Doximity's financial reporting system and assisting the Board with its oversight of the adequacy and effectiveness of Doximity's internal controls over financial reporting and its disclosure controls and procedures. Specifically, according to the Audit Committee's charter, the Audit Committee's responsibilities include:

- Reviewing significant internal control issues and audit measures addressing material control deficiencies;
- Discussing with the CEO and CFO significant control deficiencies, material weaknesses, and fraud involving management or employees with substantial financial reporting responsibilities when brought to the Committee's attention;
- Reviewing quarterly financial statements, related management disclosures, and significant financial reporting issues with management and the independent auditors before SEC filings;
- Discussing earnings releases, financial information, and earnings guidance provided to analysts and rating agencies;
- Reviewing the policies and procedures governing management's assessment and management of risk;

- Establishing procedures for receiving and addressing accounting, internal control, and auditing complaints, including confidential employee reports; and
- Reporting regularly to the Board on financial reporting integrity, legal and regulatory compliance, and audit-related matters.

76. During the Relevant Time Period, Defendants Cabral and Spain served continuously on the Audit Committee, with Cabral serving as Chair. Defendant Benjamin served on the Audit Committee until November 2025, when Defendant Wampler replaced her and served through the remainder of the Relevant Time Period (collectively, the "Audit Committee Defendants").

77. In violation of the Audit Committee Charter, and their general duties as members of the Audit Committee, the Audit Committee Defendants conducted little, if any, oversight of the Company's internal controls over financial reporting, resulting in materially false and misleading statements regarding the Company's business and consciously disregarded their duties to monitor such controls. The Audit Committee's complete failure to perform their duties in good faith resulted in misrepresentations to the public and the Company's stockholders.

78. In addition, as officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act, the Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to make false and misleading statements of material fact about the Company's maintaining adequate internal controls and compliance with applicable rules and regulations.

79. The Defendants' flagrant violations of their fiduciary duties and unwillingness to heed the requirements of their Audit Committee Charter have inflicted, and will continue to inflict, significant harm on Doximity.

## DERIVATIVE ALLEGATIONS

80. Plaintiff brings this action derivatively in the right and for the benefit of Doximity to redress injuries suffered by Doximity as a direct result of the Director Defendants' breaches of fiduciary duty. Doximity is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

81. Plaintiff will adequately and fairly represent the interests of Doximity in enforcing and prosecuting the Company's rights.

82. Plaintiff was a stockholder of Doximity at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is currently a Doximity stockholder.

## DEMAND FUTILITY ALLEGATIONS

83. Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth as though fully set forth herein.

84. The Doximity Board currently has six directors: Tangney, Spain, Wampler, Benjamin, Cabral, and Yang.

85. Plaintiff has not made any demand on Doximity's current Board to institute this action against the Director Defendants, as any pre-suit demand would be excused. The Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

86. The Director Defendants had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. In addition, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that

the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.

87. The Director Defendants' making or authorization of the false and misleading statements discussed above caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of Doximity. The failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required due diligence, constitute breaches of fiduciary duties that have resulted in the Director Defendants facing a substantial likelihood of liability. The Director Defendants could not fairly and fully prosecute this action or any other action concerning the misconduct described above.

### A. Demand is Excused as to Defendant Tangney

88. Defendant Tangney served as Doximity's Chief Executive Officer and Chairman throughout the Relevant Time Period. The 2025 Proxy reports compensation of $17,234,989 for fiscal 2025. The Company subsequently reported compensation of $19,586,169 for fiscal 2026. The 2025 Proxy identifies the other five directors as independent under NYSE standards and does not identify Tangney as independent.

89. Tangney's alleged involvement extends beyond general supervisory responsibilities. He personally made repeated statements concerning the Newsfeed's contribution to revenue growth, user engagement, Doximity's advertising methods, and its competitive position. On August 8, 2024, Tangney attributed growth in revenue and adjusted EBITDA to Newsfeed engagement and represented that

Doximity was gaining market share. On November 7, 2024, he again attributed revenue growth to the Newsfeed, describing it as the Company's principal revenue driver. He continued to emphasize purportedly record engagement on February 6, May 15, and August 7, 2025.

90. On May 15, 2025, Tangney specifically denied that Doximity offered an e-newsletter product. This representation concerned the Company's actual advertising methods, rather than merely a prediction of future performance. As alleged above, Doximity relied heavily on email newsletters and banner advertisements while publicly distinguishing its business through claims of deep engagement.

91. Tangney continued to promote Newsfeed engagement after the Company began disclosing slowing growth. On November 6, 2025, he again attributed Doximity's performance to Newsfeed activity. On February 5, 2026, the Company's earnings announcement quoted Tangney as emphasizing record engagement despite its reduced revenue guidance and slowing sales growth.

92. Tangney also signed the Company's fiscal 2025 Form 10-K, filed on May 20, 2025, as Chief Executive Officer and director. His personal statements and participation in the Company's reporting are relevant to his involvement in the challenged disclosures. Plaintiff alleges that Tangney knowingly misrepresented the advertising methods and competitive conditions underlying the Company's reported growth.

93. Tangney's financial incentives included a fiscal 2025 cash incentive weighted 67% to revenue and 33% to adjusted EBITDA, resulting in a $1,200,000 award. Plaintiff alleges that these incentives are relevant to his motive when considered together with his personal participation and knowledge; compensation alone is not the basis for the claim that he received an improper benefit.

94. Tangney is a named defendant in the Securities Class Action. That action also alleges that Gross promoted Doximity's competitive position and ability

to gain market share on November 7, 2024, and that Gold attributed the February 2026 slowdown to temporary customer budgeting practices. Bryson is named as a defendant and signed the fiscal 2025 Form 10-K as Chief Financial Officer. Plaintiff's claims against Tangney rest on his own conduct and knowledge, rather than attribution to him of every statement made by another officer.

95. Based on Tangney's direct participation in the challenged statements and the particularized knowledge alleged above, Plaintiff alleges that he faces a substantial likelihood of liability for non-exculpated breaches of fiduciary duty. A demand would require him to evaluate whether Doximity should pursue claims arising from his own alleged knowing misconduct. Accordingly, Plaintiff alleges that demand is excused as to Tangney.

**B. Demand is Excused as to Defendant Cabral**

96. Defendant Cabral served on the Board and chaired the Audit Committee throughout the Relevant Time Period. The 2025 Proxy reports fiscal 2025 director compensation of $287,098. Cabral signed the Company's fiscal 2025 Form 10-K.

97. As Audit Committee Chair, Cabral had responsibilities under the Committee's Charter to oversee the financial reporting process, review significant internal control issues, participate in discussions concerning earnings releases and guidance, and report material matters to the Board. Those responsibilities encompassed review and discussion of disclosures relevant to the Company's financial performance. They did not, standing alone, establish that Cabral knew any particular statement was false.

98. Plaintiff alleges that, despite the information identified above, Cabral consciously failed to exercise the Audit Committee's authority to investigate the discrepancies, require accurate disclosure, or bring the matter to the Board's attention. Plaintiff's claim concerns a knowing failure to respond to identified reporting risks, rather than an unsuccessful exercise of business judgment. These

particularized facts support Plaintiff's allegation that Cabral faces a substantial likelihood of liability for a non-exculpated breach of his duties of loyalty and good faith and could not impartially consider a demand.

**C. Demand is Excused as to Defendant Spain**

99. Defendant Spain served on the Board and Audit Committee and chaired the Compensation Committee during the Relevant Time Period. The 2025 Proxy reports fiscal 2025 director compensation of $291,348; his cash fees were paid to his employer, Emergence Capital Partners, on his behalf. Spain signed the fiscal 2025 Form 10-K.

100. Spain's Audit Committee responsibilities included the financial reporting, internal control, earnings disclosure, and complaint-review functions described above. His Compensation Committee responsibilities also placed him in a position to evaluate the risks associated with executive incentives.

101. The revenue and adjusted EBITDA metrics described above linked Tangney's fiscal 2025 cash incentive to Company performance. Their use does not, by itself, establish that Spain incentivized fraud or approved improper compensation.

102. Plaintiff alleges that Spain consciously failed to respond to the information identified above and permitted the challenged disclosure practices to continue. Based on those particularized facts, Plaintiff alleges that Spain faces a substantial likelihood of liability for non-exculpated breaches of fiduciary duty and could not impartially consider a demand addressing his own conduct.

**D. Demand is Excused as to Defendant Benjamin**

103. Defendant Benjamin served on the Board throughout the Relevant Time Period and on the Audit Committee until November 2025. The 2025 Proxy reports fiscal 2025 director compensation of $281,473. Benjamin signed the fiscal 2025 Form 10-K.

104. The Company's 2026 proxy statement discloses an additional consulting relationship beginning in November 2025 and extending through May 15, 2028, providing approximately $2 million in equity compensation. Her reported fiscal 2026 compensation totaled $749,954, including $483,795 in consulting-related equity awards. Unlike the 2025 Proxy, the 2026 disclosure does not identify Benjamin as an independent director.

105. Benjamin's continuing consulting relationship warrants consideration separately from her ordinary board compensation.

106. Plaintiff alleges that these particularized circumstances compromise her ability to evaluate claims against the persons to whom she is beholden.

107. During her Audit Committee service, Benjamin also had the responsibilities described above concerning financial reporting, internal controls, earnings disclosures, and accounting complaints.

108. Based on those facts and the particularized dependence alleged concerning her consulting relationship, Plaintiff alleges that demand is excused as to Benjamin.

### E. Demand is Excused as to Defendant Wampler

109. Defendant Wampler served on the Board and Compensation Committee during the Relevant Time Period and joined the Audit Committee in November 2025. The 2025 Proxy reports fiscal 2025 director compensation of $282,973. Wampler signed the fiscal 2025 Form 10-K.

110. The 2026 proxy statement reports fiscal 2026 compensation of $310,284, including $36,000 for strategic communications advisory services outside her director role. It nevertheless identifies her as independent under NYSE standards.

111. Wampler's Audit Committee service overlapped the later disclosures concerning slowing growth and management's continued emphasis on engagement.

Her separate communications advisory work may also bear on the challenged statements, depending on the actual scope and timing of her services.

112. Plaintiff alleges that Wampler knowingly participated in or consciously failed to address the misleading disclosures identified above. Her Compensation Committee service also bears on the incentive decisions described in paragraph 9, to the extent supported by particularized allegations of knowledge and participation. Based on those facts, Plaintiff alleges that Wampler faces a substantial likelihood of non-exculpated liability or lacks independence from an interested person and therefore could not impartially consider a demand.

**F. Demand is Excused as to Defendant Yang**

113. Defendant Yang served on the Board and Compensation Committee during the Relevant Time Period. The 2025 Proxy reports fiscal 2025 director compensation of $278,598. Yang signed the fiscal 2025 Form 10-K. She did not join the Audit Committee until July 2026, after the Relevant Time Period.

114. Plaintiff's allegations concerning Yang therefore rest on her own conduct as a director and Compensation Committee member during the Relevant Time Period, rather than Audit Committee duties she assumed afterward.

115. Plaintiff alleges that Yang consciously disregarded the information identified above or knowingly participated in the challenged conduct. Based on those particularized facts, Plaintiff alleges that she faces a substantial likelihood of liability for non-exculpated breaches of fiduciary duty or lacks independence from an interested person and could not impartially consider a demand.

116. Based on the facts alleged herein, at least three members of the six-member Board could not impartially consider a demand to pursue the claims asserted herein and there is a substantial likelihood that Plaintiff will be able to prove that these individuals breached their fiduciary duties by condoning the misconduct and failing to take meaningful action to remedy the resultant harm.

## CLAIMS FOR RELIEF
## COUNT I

### Breach of Fiduciary Duty
### (Derivatively Against The Director Defendants)

117. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

118. Each of the Director Defendants owed and owes Doximity the highest obligations of loyalty, good faith, due care, and oversight.

119. Each of the Director Defendants violated and breached their fiduciary duties of loyalty, good faith, candor and oversight to the Company.

120. The Director Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. In breach of their fiduciary duties, the Director Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

121. In addition, the Director Defendants further breached their fiduciary duties owed to Doximity by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact and allowing the Company to operate with inadequate internal controls which resulted in the misrepresentations and failure to disclose that (a) Doximity overstated the Newsfeed's contribution to revenue growth; (b) the Company relied heavily on banner advertisements and email newsletters, contrary to its representations concerning its advertising methods and deep engagement; and (c) the Company was losing market share to competitors offering more favorable pricing and engagement models. The Director Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact, exposing them to personal liability to the Company for breaching their fiduciary duties.

122. The Director Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the wrongdoing set forth herein and to fail to maintain adequate internal controls. The Director Defendants had actual knowledge that the Company was engaging in the wrongdoing set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the wrongdoing and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Director Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

123. As a direct and proximate result of the breaches of duty alleged herein, Doximity has sustained and will sustain significant damages.

124. As a result of the misconduct alleged herein, these Defendants are liable to the Company.

125. Plaintiff, on behalf of Doximity, has no adequate remedy at law.

## COUNT II

### Breach of Fiduciary Duty
### (Derivatively Against the Officer Defendants)

126. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

127. The Officer Defendants are executive officers of the Company. As executive officers, the Officer Defendants owed and owe Doximity the highest obligations of loyalty, good faith, due care, oversight, and candor.

128. The Officer Defendants breached their fiduciary duties owed to Doximity by willfully or recklessly making and/or causing the Company to make

false and misleading statements and omissions of material fact, failing to disclose that (a) Doximity overstated the Newsfeed's contribution to revenue growth; (b) the Company relied heavily on banner advertisements and email newsletters, contrary to its representations concerning its advertising methods and deep engagement; and (c) the Company was losing market share to competitors offering more favorable pricing and engagement models. The Officer Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact.

129. As a direct and proximate result of the breaches of duty alleged herein, Doximity has sustained and will sustain significant damages.

130. As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

131. Plaintiff, on behalf of Doximity, has no adequate remedy at law.

**COUNT III**

**Gross Mismanagement**
**(Against All Defendants)**

132. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

133. By their actions alleged herein, the Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation

134. As a direct and proximate result of the Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages.

135. As a direct and proximate result of the gross mismanagement and breaches of duty alleged herein, Doximity has sustained and will sustain significant damages.

136. As a result of the misconduct alleged herein, the Defendants are liable to the Company.

137. Plaintiff, on behalf of Doximity, has no adequate remedy at law.

## COUNT IV

## Waste of Corporate Assets (Derivatively Against All Defendants)

138. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

139. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Time Period. It resulted in continuous, connected, and ongoing harm to the Company.

140. As a result of the misconduct described above, the Defendants wasted corporate assets by, inter alia: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

141. As a direct and proximate result of the waste of corporate assets and breaches of duty alleged herein, Doximity has sustained significant damages.

142. As a result of the misconduct alleged herein, the Defendants are liable to the Company.

143. Plaintiff, on behalf of Doximity, has no adequate remedy at law.

## COUNT V

## Unjust Enrichment (Derivatively Against the Officer Defendants)

144. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

145. By their wrongful acts, violations of law, and false or misleading statements or omissions of material fact that they caused to be made, the Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

146. The Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Defendants' bad faith conduct.

147. Plaintiff, on behalf of Doximity, seeks restitution from the Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Defendants due to their wrongful conduct and breach of their fiduciary duties.

## COUNT VI
## Violation of Section 14(a) of the Exchange Act
## (Against The Director Defendants)

148. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

149. The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

150. The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to

stockholders which were contained in the 2025 Proxy. In the 2025 Proxy, the Board solicited stockholder votes to reelect the Director Defendants to the Board.

151. The 2025 Proxy, however, misrepresented and failed to disclose the Board's risk oversight and the Company's inadequate internal controls, which facilitated the illegal behavior described herein. By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, Doximity misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect the Director Defendants.

152. Plaintiff, on behalf of Doximity, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2025 Proxy in connection with the improper reelection of the Director Defendants to the Board.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of Doximity and that Plaintiff is a proper and adequate representative of the Company;

B. Against all of the Defendants and in favor of Doximity for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

C. Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

D. Awarding Doximity restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F. Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: September 28, 2026

**LAW OFFICE OF FRANCIS J. FLYNN, JR.**

By: /s/ Francis J. "Casey" Flynn, Jr.
Francis J. "Casey" Flynn, Jr., #304712
6057 Metropolitan Plz
Los Angeles, CA 90036
Telephone: (314) 662-2836
Email: casey@lawofficeflynn.com

**BRIAN MURRAY LAW PLLC**

Brian P. Murray*
750 E. Main Street
Suite 620
Stamford, CT 06901
Phone: (203) 246-2368
Email: bmurray@brianmurraylaw.com

**ROWLEY LAW PLLC**
Shane T. Rowley, Esq.*
Danielle Rowland Lindahl, Esq.*
50 Main Street, Suite 1000
White Plains, New York 10606
Phone: (914) 400-1920
Fax: (914) 301-3514
Email: srowley@rowleylawpllc.com
drl@rowleylawpllc.com

* Pro hac vice applications forthcoming

**COUNSEL FOR PLAINTIFFS**